UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DOVEY HATCHETT,                        )
       *Plaintiff*,                    )
                                       )
       *vs.*                          )     1:11-cv-1266-JMS-TAB
                                       )
ERIC K. SHINSEKI, *Secretary of Veterans Af-*   )
*fairs*,                               )
       *Defendant*.                   )

## ORDER

Presently pending before the Court is a Motion for Summary Judgment filed by Defend-

ant Eric K. Shinseki, the Secretary of Veterans Affairs (the "VA").  [Dkt. 31.]  Plaintiff Dovey

Hatchett alleges that her federal employer, the VA discriminated against her and that she suf-

fered a hostile work environment because she is African American.[1]  [Dkt. 1.]  The VA moves

for summary judgment, claiming that Ms. Hatchett has waived the right to pursue some of her

claims and that summary judgment must be entered in its favor on any remaining claims.  For the

reasons that follow, the Court grants the VA's motion.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncon-

troverted and admissible evidence is unnecessary because, as a matter of law, it would conclude

in the moving party's favor.  *See* Fed. R. Civ. Pro. 56.  To survive a motion for summary judg-

ment, the non-moving party must set forth specific, admissible evidence showing that there is a

---

[1] Ms. Hatchett initially alleged sex and age discrimination claims as well, but she has elected not
to pursue those claims and judgment in favor of Defendants on those claims is therefore in order.
[Dkt. 52 at 11 n.4.]

material issue for trial.  Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. Pro. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. Pro. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. Pro. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment.  Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003).  Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment.  *Id.* at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact.  *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).  And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and re-

solve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex*, 477 U.S. at 330.

## II.
### BACKGROUND

The following facts are primarily undisputed, except as noted.  Where there is a genuine dispute, all reasonable inferences are made in favor of Ms. Hatchett, the non-movant.

### A.   Background of the Environmental Maintenance Service

The Richard L. Roudebush VA Medical Center ("VAMC") is located in Indianapolis and is the only tertiary care veterans' facility in Indiana.  [Dkt. 31-2 at 2.]  It provides acute inpatient, medical, surgical, psychiatric, neurological, and rehabilitation care, as well as specialized outpatient services.  [*Id*. at 1-2.]

The Environmental Maintenance Service ("EMS") is responsible for maintaining the cleanliness and sanitation of the VAMC.  [*Id.* at 2.]  EMS employs approximately 95 employees, who are hired under a special hiring authority.  [*Id*.]

Ms. Hatchett started working for the VA in 1979.  [Dkt. 31-1 at 16.]  She became a housekeeping aide supervisor for EMS in February 1992.  [*Id.*]  In that position, she had supervisory responsibilities over designated staff, including assigning work, instructing employees, approving and denying leave, and completing performance appraisals.  [Dkts. 31-4 at 2; 31-1 at 16-17.]  EMS had six supervisors during the relevant time period—one weekend supervisor, two day-shift supervisors, two evening-shift supervisors, and one night-shift supervisor.  [Dkt. 31-2 at 2.]  Ms. Hatchett was a day-shift supervisor.  [Dkt. 31-1 at 19.]

Ms. Hatchett's immediate supervisor during the relevant time period was Sylvia Clark, the Assistant Chief of EMS.  [Dkt. 31-4 at 2.]  Ms. Clark did not have authority to propose suspensions or removals or to issue admonishments or reprimands for EMS employees.  [Dkt. 31-4

at 2.]  Ms. Hatchett's second-line supervisor during the relevant time period was Nicholas Von

Bank, the Chief of EMS.  [Dkt. 31-2 at 1.]  As Chief, Mr. Von Bank was responsible for over-

sight and management of the entire staff and had the authority to propose discipline to Thomas

Mattice, the Medical Center Director.  [*Id.* at 2, 8; dkt. 31-6 at 1-2.]  Mr. Mattice made the final

decision regarding discipline, including terminating an employee.  [Dkt. 31-6 at 1.]

Ms. Hatchett alleges that Mr. Von Bank and Ms. Clark discriminated against her based

on her race.  [Dkt. 52 at 7.]  Ms. Hatchett has designated two affidavits from other African

American employees who allege that Mr. Von Bank and Ms. Clark treated Caucasian employees

more favorably.[2]  [Dkts. 52-2 at 1; 52-4 at 1.]

**B.  Released Conduct**

*1.  Settlement Agreements*

During the relevant time period, Ms. Hatchett twice participated in mediation with vari-

ous co-workers.  [Dkt. 31-10 at 8-11.]  As a result of those mediations, Ms. Hatchett entered into

settlement agreements dated January 29, 2010 and March 24, 2010, each of which contained a

release that provided as follows:

> [T]he Employee hereby . . . Waives any and all actions, claims, complaints, EEO
> complaints, grievances, appeals and proceedings of whatever nature against the
> Agency, its past and present officers and employees, in their personal as well as
> their official capacities, including attorney fees, which are now or hereafter may
> be asserted by him/her or his/her behalf based on any action taken as of the date
> of the Employee's execution of this agreement, with the exception of any claims
> that may arise by reason of breach of any term of this mediation agreement.

[Dkts. 31-10 at 8, 10.]

---

[2] Ms. Hatchett submitted a third, unsigned declaration in support of this position.  [Dkt. 52-3.]
That document represents that a signed copy would be filed upon receipt, but that never oc-
curred.  Because the declaration is unsigned, the Court will not consider it.  28 U.S.C. § 1746.

As is explained in detail in Part III.A.1 of this opinion, the Court concludes that all conduct that occurred before March 24, 2010—the date on which Ms. Hatchett signed the second release—cannot be actionable because Ms. Hatchett has waived her claims regarding those events.  Because those events are still helpful for understanding the scope of Ms. Hatchett's employment as well as what the Court will not consider in addressing her claims, the Court will briefly summarize the relevant events that occurred before Ms. Hatchett signed the releases.

### 2.   *Relevant Conduct Before March 24, 2010*

In 2007, seven of Ms. Hatchett's subordinates accused her of threatening them.  [Dkt. 31-1 at 32.]  Ms. Hatchett received a three-day suspension after an investigation into those complaints.  [*Id.* at 33, 43.]

In November 2009, Ms. Hatchett and her fellow day-shift supervisor switched shifts with the evening-shift supervisors.  [Dkt. 31-1 at 37.]  She was paid more during that time since evening supervisors were paid at a higher rate.  [*Id.*]  Ms. Hatchett stayed on the night shift two weeks longer than she anticipated, but she did not complain about it because she "didn't want to create a problem."  [*Id.* at 37-38.]  Two supervisors had retired when Ms. Hatchett returned to the day shift, so Ms. Hatchett was given one of their assignments.  [Dkt. 31-5 at 8.]

On December 4, 2009, Ms. Hatchett received a reprimand for failing to follow proper leave requesting procedures and unexcused or unauthorized absence.  [Dkt. 31-2 at 17.]

Around February 1, 2010, Mr. Von Bank received multiple reports from employees that Ms. Hatchett had engaged in a heated discussion with other EMS employees during a retirement party.  [Dkt. 31-2 at 3, 10-15.]  During the exchange, Ms. Hatchett allegedly used a derogatory term directed at a gay employee.  [Dkts. 31-2 at 11; 31-5 at 9.]  She also allegedly told that employee to complain to Ms. Clark and "the white man" (referring to Mr. Von Bank) if they had a

problem with her.  [Dkts. 31-2 at 12, 15; 31-5 at 9.]  Ms. Hatchett denies making those comments.  [Dkt. 31-2 at 16.]

### C.   Non-Released Conduct After March 24, 2010

On April 5, 2010, after investigating the incident that occurred during the retirement party, Mr. Von Bank proposed suspending Ms. Hatchett for fourteen days without pay for "disrespectful conduct; use of insulting, abusive, or obscene language about other personnel; and failure to uphold the Indy Excellence Standards of Performance."  [Dkt. 31-2 at 3, 17-18.]  Ultimately, that penalty was mitigated and Ms. Hatchett served a five-day suspension in May 2010.  [Dkt. 31-2 at 3.]

In July 2010, Mr. Von Bank received a complaint from one of Ms. Hatchett's subordinates, Michael Davidson, that "on *several* occasions" Ms. Hatchett had been rude and disrespectful.  [Dkt. 31-2 at 19 (original emphasis).]  Mr. Davidson complained that Ms. Hatchett was confrontational, lacked appropriate communications skills, and spoke in a harsh and rude tone.  [*Id.*]  Specifically, Mr. Davidson detailed two incidents where he felt Ms. Hatchett's behavior was inappropriate.  [*Id.* at 20.]

On July 19, 2010, Mr. Von Bank asked Ms. Hatchett to leave a supervisory staff meeting after she became defensive and disruptive.  [Dkt. 31-2 at 4, 21-23.]  Ms. Hatchett expressed concerns that she was being attacked, but Mr. Von Bank told her that the subject of the meeting was not directed at her.  [*Id.*]  Mr. Von Bank later told Ms. Clark that she could see if Ms. Hatchett wanted to return to the meeting.  [Dkt. 31-5 at 11.]  Ms. Clark contacted Ms. Hatchett, but Ms. Hatchett declined to return to the meeting.  [*Id.* at 11-12.]

On August 23, 2010, the VAMC was preparing for a visit from Eric Shinseki, the Secretary of Veterans Affairs.  [Dkt. 31-2 at 4, 24.]  All supervisors had been instructed to be out on

the floors at 8:30 a.m. to ensure that their areas were ready.  [*Id.*]  Ms. Hatchett contends that her instructions were to "monitor" the wards, not necessarily to observe them continuously.  [Dkt. 52-5 at 1.]  At 10:30 a.m., Ms. Clark went to the supervisors' office after receiving a complaint that Ms. Hatchett was not monitoring her areas.  [Dkt. 31-2 at 24.]  Ms. Hatchett informed Ms. Clark that she had not been to the wards yet because she was talking to another employee and setting up her voicemail.  [*Id.*]  Ms. Clark told her that "was the last thing on the list of priorities" and that she "needed [Ms. Hatchett] on the wards."  [*Id.*]  The day of the Secretary's visit, Ms. Clark reported to Mr. Von Bank that Ms. Hatchett failed to follow Ms. Clark's instructions regarding where to be.  [*Id.* at 4, 24.]

On August 26, 2010, Mr. Von Bank received a complaint that Ms. Hatchett had opened a sealed letter that was marked "Confidential" and labeled with another employee's name on the outside of the envelope.  [Dkt. 31-2 at 4, 25.]  Ms. Clark reported that Ms. Hatchett later confirmed to her that she had read some of the letter.  [*Id.*]

On August 27, 2010, Mr. Von Bank received a complaint from Ms. Hatchett's co-supervisor during the daytime shift, La Gail Brounson.  [Dkt. 31-2 at 5, 26.]  Ms. Brounson informed Mr. Von Bank that although she had worked at the VA for more than twenty years without a problem with a co-worker, her two and one-half years working with Ms. Hatchett had been "very stressful and unpleasant."  [*Id.* at 26.]  Ms. Brounson detailed various incidents and reported that although she had shared an office with Ms. Hatchett, she had to ask to move because "it just became unbearable."  [*Id.* at 26.]

On August 30, 2010, Mr. Von Bank informed Ms. Hatchett that effective immediately, and until further notice, she would be removed from performing her duties as a supervisor pending the results of an investigation into recent events.  [Dkt. 31-2 at 5, 27.]  Ms. Hatchett was to

- 7 -

report to Ms. Brounson and her pay and benefits were not affected during the investigation.  [*Id.*]
Ms. Hatchett disagreed with the decision to temporarily reassign her.  [*Id.* at 27.]

On October 1, 2010, after the investigation, Mr. Von Bank decided to propose Ms.
Hatchett's removal.  [Dkt. 31-2 at 5, 28-30.]  The Proposed Notice of Removal detailed four of
the incidents involving Ms. Hatchett and charged her with creating an unnecessary disruption to
a staff meeting; two counts of failure to follow supervisory instructions; loafing, willful idleness,
or wasting time; and failure to safeguard confidential information.  [*Id.* at 28-29.]  The notice
informed Ms. Hatchett of her right to reply either orally or in writing within seven days to Mr.
Mattice.  [*Id.* at 30.]

Within seven days, an attorney for Ms. Hatchett contacted Mr. Mattice to inform him that
he had been engaged to represent Ms. Hatchett in the matter.  [Dkt. 31-6 at 3.]  Mr. Mattice later
held a meeting with Ms. Hatchett's counsel and two representatives of the VAMC Employee and
Labor Relations Department.  [*Id.*]  Mr. Von Bank and Ms. Clark were not present at the meet-
ing.  [*Id.*]  Ms. Hatchett's counsel told Mr. Mattice that Ms. Hatchett had filed a complaint with
the Department of Veterans Affairs Office of Employment Discrimination ("EEO") in July 2010
due to Mr. Von Bank forcing her to leave the staff meeting.  [*Id.* at 4.]  Ms. Hatchett's counsel
disputed the charges against Ms. Hatchett and questioned the credibility of Mr. Von Bank and
Ms. Clark.  [*Id.* at 4-5.]  Counsel asserted that Mr. Von Bank had a grudge against Ms. Hatchett
and was pursuing her removal, stemming from her opposition to the fourteen-day suspension he
proposed in 2007.  [*Id.* at 5.]  Mr. Mattice noted that three years had elapsed between that inci-
dent and the present action, which Mr. Mattice believed indicated that Mr. Von Bank was not
pursuing Ms. Hatchett's removal.  [*Id.*]

After considering all of the information presented to him, Mr. Mattice found Ms. Hatchett's arguments to be unpersuasive.  [Dkt. 31-6 at 6.]  He upheld the charges in their entirety; however, he mitigated the proposed punishment from termination to demotion.  [*Id.* at 6, 8.]  Among other things, Mr. Mattice noticed that multiple staff members corroborated the alleged incidents and that four different management officials had been involved in Ms. Hatchett's disciplinary actions.  [*Id.* at 7.]  Mr. Mattice found it implausible that all of those officials would be biased against Ms. Hatchett or would collaborate to retaliate against her.  [*Id.* at 8.]  Ultimately, Mr. Mattice decided to demote Ms. Hatchett from her position as Supervisory Housekeeping Aide to the position of Housekeeping Aide.  [*Id.*]  This demotion reduced Ms. Hatchett's hourly pay from $27.10 to $19.20, effective January 2, 2011.  [*Id.*]  In her new position, Ms. Hatchett was to report to Ms. Brounson.  [*Id.* at 25.]  Mr. Mattice felt that demotion was an appropriate sanction for Ms. Hatchett's behavior, given her "refusal to accept responsibility for her actions or show any remorse whatsoever, [which] had destroyed the trust of her supervisors."  [*Id.* at 9.]

On January 2, 2011, Ms. Clark asked Ms. Hatchett to remove her belongings from the supervisors' office now that she was no longer a supervisor.  [Dkt. 31-4 at 6.]  When she had not done so by February 2, 2011, Ms. Clark instructed her again to remove her items and gave her a deadline of February 4, 2011.  [*Id.*]  On February 3, 2011, Ms. Clark received a call from Ms. Brounson—Ms. Hatchett's supervisor after her demotion—reporting that Ms. Hatchett was in the supervisors' office.  [*Id.*]  Ms. Clark went to the office and asked Ms. Hatchett if she wanted to use a cart to make it easier to transport her items.  [*Id.*]  According to Ms. Clark, Ms. Hatchett "raised her voice stating that she was not taking anything out of the office at that time."  [*Id.*]  When Ms. Clark asked her what she was doing in the office if she was not removing her items, Ms. Hatchett "again raised her voice asking what [Ms. Clark] was doing in the supervisors' of-

fice." [*Id.*]  Accordingly to Ms. Clark, Ms. Hatchett continued to yell and "came physically close to [Ms. Clark]" and told her that she did not need to leave the office. [*Id.* at 7.]  When Ms. Clark informed Ms. Hatchett that she was going to call Police Services if Ms. Hatchett did not leave the office, Ms. Clark claimed that Ms. Hatchett yelled "I don't give a damn who you call, you called them on me before when you lied on me." [*Id.*]  As Ms. Clark began to call Police Services, Ms. Hatchett reached to apparently try to hang up her phone. [*Id.*]  Ms. Hatchett ultimately left the office. [*Id.*]

Mr. Von Bank received a call on February 3, 2011, during the disturbance in the supervisor's office. [Dkt. 31-2 at 7.]  As he walked towards the office, he heard loud talking from a linen room down the hall and claims to have heard Ms. Hatchett "almost yelling" and say "I don't give a shit what they say." [*Id.*]  Mr. Von Bank continued towards the supervisors' office in an effort to find Ms. Clark. [*Id.*]  Shortly thereafter, three police officers went to speak to Ms. Hatchett in the linen room. [*Id.*]  Ms. Hatchett requested that they take her to the psychiatry unit. [Dkt. 31-1 at 59.]  Due to Ms. Hatchett's "high level of agitation even after being asked to calm down," the police asked her to leave work and not return until the following day. [Dkts. 31-1 at 59; 31-2 at 38.]

There were at least four witnesses to the incident in the supervisors' office on February 3rd, [dkt. 31-2 at 37], and Mr. Von Bank received multiple incident reports from staff members, [*id.* at 32-35].  Ms. Hatchett was placed on administrative leave the following day. [Dkts. 31-1 at 13; 31-1 at 15.]

Mr. Von Bank spoke with his supervisor—Assistant Director Jeff Nechanicky—about his desire to again propose Ms. Hatchett's termination. [Dkt. 31-2 at 8.]  Mr. Nechanicky concurred

with Mr. Von Bank's proposal and ultimately signed the Notice of Proposed Removal because Mr. Von Bank was out of the office on official travel at that time.  [*Id.*]

On February 22, 2011, Mr. Mattice received the Notice of Proposed Removal.  [Dkt. 31-6 at 10, 28-29.]  The Proposed Notice of Removal detailed the incident that occurred in the supervisors' office on February 3, 2011 and charged Ms. Hatchett with disrespectful conduct and causing a disruption in the workplace.  [*Id.* at 28.]  It noted that this was not the first time Ms. Hatchett had been disciplined, referencing her demotion earlier that year and the three-day suspension she received in 2007 for disrespectful conduct.  [*Id.*]  The notice informed Ms. Hatchett of her right to reply orally, in writing, or both and that she may submit supporting evidence.  [*Id.* at 28-29.]  Ms. Hatchett did not reply to the Notice of Proposed Removal and did not submit any evidence.  [*Id.* at 11.]

On March 18, 2011, after considering the evidence before him, Mr. Mattice concluded that Ms. Hatchett should be removed from her employment with the VAMC, effective April 10, 2011.  [*Id.* at 11, 31-33.]  Mr. Mattice found Ms. Hatchett's length of service to be a mitigating factor but her past disciplinary record, nature and seriousness of the offense, effect of the offense on her ability to perform at a satisfactory level and its effect on her supervisor's confidence in her ability to be aggravating factors.  [*Id.* at 11, 30.]

### D.  Ms. Hatchett Applies for Retirement

On February 8, 2011—five days after the incident in the supervisors' office but before receiving the second Proposed Notice of Removal—Ms. Hatchett applied for retirement.  [Dkt. 31-1 at 14.]  She never stopped the retirement process and, ultimately, her retirement became effective on April 8, 2011—two days before her termination would have become effective.  [*Id.* at 12-13, 61-62.]

- 11 -

### E.  Ms. Hatchett's EEO Complaint

Ms. Hatchett first contacted an EEO counselor on July 20, 2010.  [Dkt. 31-10 at 2.]  Ms. Hatchett knew that an employee had 45 days from an alleged incident of discrimination to contact the EEO.  [Dkt. 31-1 at 7.]  Ms. Hatchett contacted the EEO the day after Ms. Clark asked her to leave a supervisory staff meeting.  [Dkt. 31-10 at 12.]  On September 4, 2010, Ms. Hatchett filed a formal EEO complaint regarding the incident.  [*Id.* at 20, 23.]  During the informal counseling period, Ms. Hatchett raised a claim of harassment, consisting of at least eight events she alleged occurred between November 22, 2009 and August 30, 2010.  [*Id.* at 27-28.]  An investigation occurred and, ultimately, the EEO issued a decision on June 23, 2011, concluding that Ms. Hatchett failed to establish by a preponderance of the evidence that she was discriminated against based on her race, sex, or age with regard to the claims raised in the complaint.  [*Id.* at 74, 76.]

The EEO decision notified Ms. Hatchett that she had 90 days to file a civil action in this Court if she did not take an appeal to the Equal Opportunity Employment Commission.  [*Id.* at 75.]  Ms. Hatchett filed this action on September 19, 2011, alleging, in relevant part, that she was discriminated against in violation of Title VII based on her race.  [Dkt. 1.]  The VA now moves for summary judgment.  [Dkt. 31.]

### III.
#### DISCUSSION

### A.  Scope of Claims

##### 1.   *Consideration of Released Conduct*

The parties dispute the effect of the waivers contained in two settlement agreements Ms. Hatchett signed after mediations during her employment.  Those settlement agreements, dated January 29, 2010 and March 24, 2010, each contained a release in with Ms. Hatchett "[w]aives

any and all actions, claims, complaints, EEO complaints, grievances, appeals and proceedings of whatever nature against the Agency . . . which are now or hereafter may be asserted by him/her or his/her behalf based on any action taken as of the date of the Employee's execution of this agreement . . . ." [Dkts. 31-10 at 8, 10.]

The VA argues that based on these releases, any claims Ms. Hatchett has based on any conduct that occurred prior to March 24, 2010 have been waived.  [Dkt. 32 at 20-21.]  Ms. Hatchett does not challenge the enforceability of the releases contained in the settlement agreements or whether they were entered knowingly and voluntarily; instead, she argues that the releases only affect one discrete incident of her claim (the November 2009 shift change) and that they do not release her overarching hostile work environment claim from that time period.  [Dkt. 52 at 9-11.]

"An employee may waive or release a Title VII claim," *Hampton v. Ford Motor Co.*, 561 F.3d 709, 716 (7th Cir. 2009), and a hostile work environment claim is a Title VII claim, *Vance v. Ball State Univ.*, 2013 U.S. LEXIS 4703, *11 (U.S. 2013).  "For a release affecting a federal right to be valid, it must not only be valid under state law, but it must also be knowing and voluntary."  *Hampton*, 561 F.3d at 716.  For the Court to reach that issue, however, "the party challenging the release must come forward with specific evidence sufficient to raise a question as to the validity of the release."  *Id.*

Ms. Hatchett does not challenge the validity of the releases under state or federal law, and she does not contend that she entered into them unknowingly or involuntarily.  [Dkt. 52 at 9-10.] Therefore, pursuant to *Hampton*, the Court may presume the validity of the releases.  561 F.3d at 716.  Instead, Ms. Hatchett's only argument is that while she acknowledges she cannot pursue claims based on discrete acts that occurred before she signed the releases, she believes that she

should be able to pursue an overarching hostile work environment claim that includes events occurring prior to the release date.  [Dkt. 52 at 10.]  Ms. Hatchett relies on United States Supreme Court precedent holding that hostile work environment claims are distinct from discrete employment actions because they occur over a length of time and, thus, are timely filed as long as an act contributing to the claim was timely filed.  [Dkt. 52 at 10-11 (citing *AMTRAK v. Morgan*, 536 U.S. 101, 115-116 (2002)).]  While the Court is aware of that precedent, the presence of an unchallenged release in this case is a material, distinguishable difference from the cited case law.  Accordingly, the Court is bound by precedent that Title VII claims can be waived, and a hostile work environment claim is undisputedly a Title VII claim.

Ms. Hatchett does not expressly argue that the releases are unambiguous with respect to her hostile work environment claim, but to the extent that argument is implicitly made, the Court notes that the Seventh Circuit and Indiana courts have concluded that releases containing language releasing "any and all" claims are unambiguous and bar "any and all" claims the claimant may have.  *Hampton*, 561 F.3d at 716; *Haub v. Eldridge*, 981 N.E.2d 96, 102-03 (Ind. Ct. App. 2012) (holding that language releasing any and all claims that a party may have against another before the date of the release is "clear and plain" and "unambiguous").  Ms. Hatchett does not argue how her hostile work environment claim would be an exception.  Accordingly, the Court concludes that she cannot bypass those releases and rely on prior conduct to support a claim here, even if it is for a hostile work environment.

To be clear, the Court is not foreclosing Ms. Hatchett's entire hostile work environment claim, but it will not consider any of the released conduct that occurred before March 24, 2010, even in the context of that claim.

- 14 -

2.   *Consideration of Non-Released Conduct*

The Court agrees with Ms. Hatchett, however, that it can generally consider the non-released conduct that occurred after March 24, 2010 as part of Ms. Hatchett's hostile work environment claim.  Specifically, the United States Supreme Court has held that

> consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period.
>
> ***
>
> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice."  42 U.S.C. § 2000e-5(e)(1).  The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*AMTRAK*, 536 U.S. at 105, 117.  Because Ms. Hatchett filed a charge within the statutory time frame, in the context of Ms. Hatchett's hostile work environment claim, the Court will analyze whether the complained of conduct that occurred after March 24, 2010 created an actionable hostile work environment.  *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684-85 (7th Cir. 2010).

**B.  Failure to Exhaust Administrative Remedies**

Ms. Hatchett argues that her discrimination claim is predicated on six incidents:

- Her temporary reassignment pending investigation on August 30, 2010

- Mr. Von Bank's proposed removal in October 2010

- Her December 2010 permanent demotion

- Mr. Von Bank's proposed removal in February 2011

- Her allegedly coerced retirement

- The decision to remove her on March 18, 2011

[Dkt. 52 at 11.]

Ms. Hatchett filed an EEO complaint on September 4, 2010.  [Dkt. 31-10 at 19-21.]  The EEO partially accepted her complaint and listed eight incidents on which Ms. Hatchett claimed she was subjected to a hostile work environment.  [*Id.* at 28-29.]  Only one of the incidents on which Ms. Hatchett now bases her discrimination claim was included in the EEO charge—the August 30, 2010 temporary reassignment pending investigation.  [Dkt. 52 at 11 (listing other incidents and asserting that those incidents "although part of Hatchett's hostile work environment claim, are *not* the bases of her discrimination.  That claim is predicated on Von Bank's disparate treatment of Hatchett with respect to discipline" and then listing the six incidents cited above.).]

The VA argues that Ms. Hatchett's discrimination claims fail because she did not exhaust her administrative remedies because she did not include those claims in her administrative complaint.  [Dkt. 32 at 30-31.]  Ms. Hatchett concedes that she did not file a separate administrative complaint to amend her EEO charge or include certain claims about which she now complains in her charge, but she contends that was unnecessary because her claims are "reasonably related to the claims that were included in her EEO claim."  [Dkt. 52 at 26-27.]

A plaintiff cannot challenge adverse employment actions in court that she did not file in her EEO charge.  *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009); *see also Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) ("[G]enerally, Title VII claims that were not included in an EEOC charge are barred.").  Instead, a plaintiff may only litigate claims that were not included in an EEO charge if the underlying events are reasonably related to the charges in the EEO complaint.  *Lloyd*, 552 F.3d at 602.  Discipline imposed for additional infractions that occur after an EEO charge are not reasonably related and, thus, unforeseeable.  *Id.*  It is not

enough to suggest that additional incidents were part of an overall general pattern of discrimination.  *Jones*, 613 F.3d at 670.  Allowing plaintiff to do that "would eviscerate the general rule that each separate act of discrimination must be set out in an EEOC charge before an action can be brought."  *Id.*

The Court agrees with the VA that Ms. Hatchett failed to exhaust her administrative remedies with respect to the five claims she now asserts that were not set out in her EEO charge.  Each of those five incidents occurred after Ms. Hatchett filed her EEO complaint, and she concedes she never added additional claims.  [Dkt. 52 at 26-27.]  While Ms. Hatchett contends that these claims are reasonably related to the claims she included in her EEO complaint, her argument is that they were part of an overall pattern of discrimination against her.  This is insufficient to make these claims reasonably related, otherwise the exception would swallow the rule.[3]  *Jones*, 613 F.3d at 670.

For these reasons, the Court concludes that Ms. Hatchett cannot pursue discrimination claims based on five of the six incidents she asserts.  [Dkt. 52 at 11.]  Specifically, she did not

---

[3] As an aside, even if Ms. Hatchett had exhausted her administrative remedies, the Court is skeptical that Mr. Von Bank's *proposed* removals are adverse employment actions on which Ms. Hatchett can base a Title VII claim.  *See O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (setting forth three general categories of materially adverse employment actions, including cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished; cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects; and cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that negatively alters her workplace environment).  To the extent Ms. Hatchett argues the mere effect of proposing discipline had a negative effect on her workplace environment, those allegations will be discussed in the context of her hostile work environment claim.  Likewise, it is not clear that Mr. Mattice's conclusion that Ms. Hatchett should be terminated is an adverse employment action because Ms. Hatchett had already applied, and been approved, for retirement.  In other words, she was not terminated.  To the extent that Ms. Hatchett makes a constructive discharge claim regarding her retirement, that claim has been waived because she did not exhaust her administrative remedies concerning such a claim.

exhaust her administrative remedies on her claims that Mr. Von Bank's proposed removals in October 2010 and February 2011; her demotion in December 2010; her allegedly coerced retirement; and Mr. Mattice's decision to remove her in March 2011 were discriminatory.  Therefore, the only remaining discrimination claim Ms. Hatchett sets forth is that she was temporarily reassigned pending investigation in August 2010.  Because she pled that claim in her EEOC charge, [dkt. 31-10 at 28], the Court will address it on the merits.

### B.  Temporary Reassignment

Ms. Hatchett argues that she suffered an actionable adverse employment action in August 2010 when her supervisory duties were removed and she was temporarily reassigned pending an investigation.  [Dkt. 52 at 11.]  Ms. Hatchett cites two pieces of evidence that she alleges proves this was the result of unlawful discrimination: 1) she was reassigned seven days after filing a Notice of Right to File Discrimination Complaint, and 2) a white supervisor who had been the subject of complaints was allegedly not reassigned.  [Dkt. 52 at 6, 13.]

The VA argues that Ms. Hatchett's temporary reassignment was based on recent complaints from her co-workers, not on any administrative action she was taking, of which there is no evidence her supervisors were aware.  [Dkt. 61 at 8.]  The VA also argues that there is no evidence that the comparator proffered by Ms. Hatchett is similarly situated.  [*Id.* at 20.]

To overcome summary judgment on a Title VII discrimination claim, Ms. Hatchett may either provide direct evidence of discrimination, *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), or show indirect evidence under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To survive summary judgment, Ms. Hatchett must first establish a prima facie case of discrimination.  *Id.* at 802.  Specifically, she must show that: (1) she was a member of a protect-

ed class; (2) she adequately performed her employment responsibilities; (3) despite adequate per-

formance, she suffered an adverse employment action; and (4) she received different treatment

than similarly situated persons who were not members of the same protected class. *See Boume-

hdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (citation omitted).   If Ms.

Hatchett can make that showing, the burden shifts to the VA to come forth with a "legitimate,

non-discriminatory reason" for its actions. *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010) (ci-

tation omitted).   If the VA can do so, it will prevail unless Ms. Hatchett can come forward with

admissible evidence that the proffered non-discriminatory reason is "a pretext for intentional dis-

crimination." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (citation

omitted).

> *1)  Adverse Employment Action*

As an initial matter, it is questionable whether Ms. Hatchett's temporary reassignment is

an adverse employment action.   Although Ms. Hatchett was temporarily removed from perform-

ing duties as a supervisor pending an investigation into recent complaints, her "grade, pay and

other benefits [were] not affected by this temporary action."   [Dkt. 31-2 at 27.]   She does not al-

lege that this reassignment affected her opportunities for future advancement, particularly be-

cause it was temporary.   A temporary reassignment, even if humiliating, is not an adverse em-

ployment action like a demotion, a failure to promote, a significant job reassignment, or a per-

manent loss of salary or benefits, and therefore has not demonstrated an adverse employment

action. *Collins v. Meike*, 52 Fed. Appx. 835, 837 (7th Cir. 2002); *see also Nichols v. Southern

Ill. Univ.*, 510 F.3d 772, 780-81 (7th Cir. 2007) (no adverse action where plaintiffs were unable

to show that undesirable assignment affected their salaries, perks, or opportunities for future ad-

vancement).   Because Ms. Hatchett's temporary reassignment became permanent after the inves-

- 19 -

tigation, the Court will give her the benefit of the doubt and proceed to the next stage of the analysis.

### 2) *Allegedly Suspicious Timing*[4]

Ms. Hatchett argues that she can prove her discrimination claim directly with evidence of suspicious timing. [Dkt. 52 at 13-14.] Specifically, Ms. Hatchett claims that she was given the temporary assignment seven days after filing a Notice of Right to File Discrimination Complaint. [Dkt. 52 at 13.]

 The VA argues that there is no evidence that Mr. Von Bank, Ms. Clark, or Mr. Mattice was aware that Ms. Hatchett had filed a Notice of Right to File Discrimination Complaint when she was reassigned. [Dkt. 61 at 8.] Moreover, the VA cites case law that timing alone cannot create a genuine issue of material fact. [*Id.* at 9.]

Circumstantial evidence that can directly prove a discrimination claim includes evidence of suspicious timing. *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). "In egregious cases, suspicious timing alone might create a triable issue on causation . . . [b]ut it rarely does." *Id.* Mere temporal proximity is not enough to create a genuine issue of material fact. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004).

Ms. Hatchett ignores that the week before she was temporarily reassigned, Mr. Von Bank received multiple complaints from Ms. Hatchett's co-workers concerning three separate incidents. First, on August 23, 2010, as the VAMC employees prepared for a visit from the Secretary of the VA, Ms. Clark and Ms. Hatchett had a disagreement regarding how often she was

---

[4] The Court notes that suspicious timing is typically used as evidence in a retaliation case, not a discrimination case where the plaintiff is alleging that they suffered an adverse employment action because they were unlawfully discriminated against. *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388-89 (7th Cir. 2012). Ms. Hatchett does not make a retaliation claim. However, because her temporary reassignment is the sole remaining discrimination claim, the Court will address her suspicious timing argument.

supposed to be monitoring her wards.  [Dkt. 31-2 at 24.]  Even after Ms. Clark informed Ms. Hatchett of her expectations, Ms. Clark alleged in a complaint to Mr. Von Bank that Ms. Hatchett failed to follow Ms. Clark's instructions on the day of the Secretary's visit.  [*Id.* at 4, 24.]

Second, Mr. Von Bank received a complaint two days later that Ms. Hatchett had opened a sealed letter that was marked "Confidential" and labeled with another employee's name on the outside of the envelope.  [Dkt. 31-2 at 4, 25.]

Third, on August 27, 2010, Mr. Von Bank received a complaint from Ms. Hatchett's co-supervisor during the daytime shift, Ms. Brounson, informing him that although Ms. Brounson had worked at the VA for more than twenty years without a problem with a co-worker, her two and one-half years working with Ms. Hatchett had been "very stressful and unpleasant."  [Dkt. 31-2 at 5, 26.]  Ms. Brounson detailed various incidents and reported that although she had shared an office with Ms. Hatchett, she had to ask to move because "it just became unbearable." [*Id.* at 26.]

After receiving complaints of these three incidents, Mr. Von Bank notified Ms. Hatchett on August 30, 2010 that "effective immediately, and until further notice, pending the results of the investigation regarding recent events, you will be removed from performing duties as a supervisor."  [Dkt. 31-2 at 27.]  The notice assured Ms. Hatchett, however, that her "grade, pay and other benefits will not be affected by this temporary action."  [*Id.*]  While on the temporary reassignment, Ms. Hatchett was to perform the duties of a Wage Grade 3 Housekeeping Aid.  [*Id.*]

Given that various employees had filed complaints regarding three separate incidents involving Ms. Hatchett the week prior to her temporary reassignment, Ms. Hatchett's timing argument fails.  This is not the type of egregious case in which timing alone can create an issue of material fact, given that unrelated complaints were filed by multiple employees about three inci-

dents the week before Ms. Hatchett's reassignment.  Additionally, as the VA points out, there is

no designated evidence that Ms. Hatchett's supervisors were aware that she had filed a Notice of

Right to File Discrimination Complaint the week before she was temporarily reassigned.  Ac-

cordingly, the Court concludes that Ms. Hatchett's alleged evidence of suspicious timing does

not create an issue of material fact sufficient to withstand summary judgment.

   *3)  Proffered Comparator*

   Because Ms. Hatchett has not provided direct evidence of discrimination, she must try to

prove her case through the indirect method.  Ms. Hatchett cites a Caucasian supervisor, Janeane

Griffin, who she contends was similarly situated but treated more favorably.  Ms. Hatchett ar-

gues that Ms. Griffin "was the subject of complaints that she was charging her subordinates to

frill out their training forms" and that she "was not detailed to a non-supervisory position."  [Dkt.

52 at 6.]  Ms. Hatchett designates affidavits from two employees who complained about Ms.

Griffin—Troy Heath and Brett Collins—to support her argument.  [*Id.* at 23 (referencing dkts.

52-2; 52-4).]  Mr. Collins and Mr. Heath attest that on several occasions they were assigned to

work for Ms. Griffin.  [Dkts. 52-2 at 2; 52-4 at 2.]  They claim that they "frequently encountered

problems" with Ms. Griffin and that that although they complained to Mr. Von Bank and Ms.

Clark, they did not see any improvement in their situations.  [*Id.*]  Neither man attests that he has

any knowledge regarding what discipline, if any, Ms. Griffin received following their com-

plaints.  [*Id.*]

   The VA argues that Ms. Griffin is not a similarly situated comparator to Ms. Hatchett.

[Dkt. 61 at 20.]  The VA contends that the declarations on which Ms. Hatchett relies are brief,

conclusory, and do not provide enough detail to establish that Ms. Griffin was similarly situated

to Ms. Hatchett and treated more favorably.  [*Id.*]

The Seventh Circuit Court of Appeals has emphasized that "the similarly-situated in-quiry is flexible, common-sense, and factual.  It asks 'essentially, are there enough common fea-tures between the individuals to allow a meaningful comparison?'"  *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).  Although similarly situated employees must be "directly compa-rable to the plaintiff in all material respects," they "need not be identical in every conceivable way[,]" and the Court is "looking for comparators, not clones."  *Id.* at 846 (citations omitted). As long as distinctions between the plaintiff and the proposed comparator are not "so significant that they render the comparison effectively useless," the similarly-situated requirement is satis-fied.  *Id.*  Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiff [has met his] burden on the issue."  *Id.* at 847.

Typically, a plaintiff must at least show that a comparator (1) had the same supervisor; (2) was subject to the same standards; and (3) engaged in "similar conduct without such differ-entiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.* (citation omitted).  The Seventh Circuit cautioned, however, that these factors are "not a 'magic formula'" and that the "similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees."  *Id.* (citation omitted).

The Court concludes that there is not sufficient evidence to show that Ms. Griffin is a similarly situated comparator who was treated more favorably than Ms. Hatchett.  The Court agrees with the VA that the affidavits Ms. Hatchett designates in support of her position do not provide enough detail for the Court to conclude that Ms. Griffin is similarly situated because there is no evidence that Ms. Griffin engaged in similar conduct as Ms. Hatchett.  While both Mr. Collins and Mr. Heath attest that they had frequent problems with Ms. Griffin when she su-

pervised them, they do not adequately detail the nature or frequency of those problems nor the nature of their complaints for the Court to be able to make an effective comparison. Perhaps the biggest hole in the evidence, however, is that there is no evidence if or how Ms. Griffin was disciplined for the unspecified incidents. In fact, although Ms. Hatchett testified in her deposition that Ms. Griffin was not given a temporary reassignment, in response to an immediate follow-up question, Ms. Hatchett admitted that she did not know. [Dkt. 31-1 at 51-52.]

Because there is no evidence that Ms. Griffin engaged in similar conduct or that she received different discipline from Ms. Hatchett as a result of the unspecified conduct, the Court must conclude that Ms. Hatchett has failed to set forth a prima facie case of discrimination. "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (citations omitted). Because Ms. Hatchett has not presented such evidence, the Court grants the VA's motion for summary judgment on her discrimination claim.

### C.  Hostile Work Environment Claim

Ms. Hatchett's temporary reassignment claim was timely filed as part of her EEO complaint; therefore, she can pursue a hostile work environment claim. *AMTRAK*, 536 U.S. at 105, 117 (holding that "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice. . . .  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.") (citation omitted).  But the Court will not consider any con-

duct that occurred before March 24, 2010, even in the context of the hostile work environment claim, because Ms. Hatchett has released her claims regarding that conduct. *See supra*, Part III.A.1. With these boundaries in mind, the Court turns to Ms. Hatchett's hostile work environment claim.

Ms. Hatchett argues that she was subjected to a hostile work environment because at various times, Mr. Von Bank proposed discipline (ranging from a fourteen-day suspension to termination) and she actually was disciplined (receiving a five-day suspension and ultimately having termination recommended). [Dkt. 52 at 24.] Specifically, Ms. Hatchett argues that her employment "was, effectively, under assault by Von Bank and Clark from April 5, 2010, the date Von Bank proposed the fourteen-day suspension, until Hatchett's retirement on April 9, 2012." [*Id.*] She cites affidavits from Mr. Heath and Mr. Collins for their proposition that "there was a general consensus among many of the African American EMS employees, including myself, that both Nick Von Bank and Assistant Chief Sylvia Clark treated white EMS employees more favorably than we were treated." [Dkts. 52-2 at 1; 52-4 at 1.]

The VA argues that Ms. Hatchett's hostile work environment claim fails as a matter of law because none of the alleged incidents rise to the level necessary to sustain a claim of this nature. [Dkt. 32 at 27.] The VA also points out that Ms. Hatchett contends that she was meeting the VA's employment expectations and admits that she was able to do everything requested of her during her employment, despite her allegedly horrible environment. [Dkt. 31-1 at 31.] It also challenges the conclusory nature of Ms. Hatchett's cited affidavits, which it contends cannot create an issue of material fact on summary judgment. [Dkt. 61 at 3-4, 12.]

To survive summary judgment on a hostile work environment claim against an employer, the employee must show: "(1) he was subject to unwelcome harassment; (2) the harassment was

based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004).  The employee must also show either that a supervisor participated in the harassment that created the hostile work environment, or that the employer was negligent in discovering or remedying it. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008).  However, a supervisor's rude, abrupt, arrogant, or dismissive behavior does not establish a hostile work environment. *Patton v. Ind. Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002); *see also McKenzie v. Milwaukee City*, 381 F.3d 619, 624-25 (7th Cir. 2004) (holding that standoffish, unfriendly, and unapproachable behavior does not establish an objectively hostile work environment).

In evaluating the severity and pervasiveness of the conduct, the Court examines "all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Russell v. Bd. of Trs.*, 243 F.3d 336, 343 (7th Cir. 2001) (*quoting Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999)).  To satisfy the "severe or pervasive" element, the employee must show that the work environment was both subjectively and objectively offensive, such that "a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).  The workplace that is actionable is one that is "hellish." *Wyninger*, 361 F.3d at 977.

The Court concludes that Ms. Hatchett has failed to make a prima facie case for her hostile work environment claim because she has not shown that her work environment was both subjectively and objectively hostile.  Even construed in a light most favorable to her, the evi-

dence that the Court can consider on her claim shows that while there may have been tension between her and her supervisors, Ms. Hatchett was not subjected to the type of objectively reasonable work environment necessary to support a hostile work environment claim. Instead, Ms. Hatchett admitted after filing the EEO complaint that while her relationship with Mr. Von Bank and Ms. Clark was "not that great", it was still "professional." [Dkt. 31-8 at 3.] She also admitted in the course of this litigation that in her opinion, those relationships did not prevent her from performing her job duties and meeting the VA's legitimate employment expectations. [Dkt. 31-1 at 31.]

Ms. Hatchett designates affidavits from two co-workers who attest that there was a common belief among the African American EMS workers that Mr. Von Bank and Ms. Clark treated Caucasian employee more favorably. [Dkts. 52-2 at 1; 52-4 at 1.] These statements are conclusory opinions. The specific instances that are recounted do not rise to the level required to establish a hostile environment. Accordingly, they are insufficient to create an issue of material fact on summary judgment. *See Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 752-753 (2006) (holding in the context of adequate performance that a conclusory affidavit from a co-worker cannot create an issue of material fact). Moreover, they do not allege that the EMS environment was the type of "hellish" environment necessary to support Ms. Hatchett's hostile work environment claim.

Even though the evidence must be viewed in a light most favorable to Ms. Hatchett, it is undisputed that during the last few years of her employment, she had repeated negative interactions with her subordinates, co-workers, and supervisors. [Dkt. 31-2 at 17-38.] Multiple employees complained about her on multiple occasions, and Mr. Von Bank did not propose discipline until receiving complaints. [Dkt. 31-2 at 17-38.] There is no evidence that the VA failed

to follow the procedures in place for discipline to be proposed, investigated, and implemented. She complains about her supervisors' allegedly rude and dismissive behavior, but that is not enough to establish a hostile work environment. *Patton*, 276 F.3d at 339; *McKenzie*, 381 F.3d at 624-25.

Ms. Hatchett may have been unhappy at work, but Title VII "does not guarantee a happy workplace." *Cerros*, 288 F.3d at 1047. And she may disagree with how Mr. Von Bank and Ms. Clark handled certain situations that involved her, but there is no evidence that she was subjected to a hostile work environment based on her race. Accordingly, the Court grants summary judgment in favor of the VA on Ms. Hatchett's hostile work environment claim.

## IV.
### CONCLUSION

For the reasons explained herein, the Court **GRANTS** the VA's Motion for Summary Judgment on Ms. Hatchett's claim. [Dkt. 31.] Ms. Hatchett has elected not to pursue her claims for sex and age discrimination; therefore, judgment is appropriate on those. With regard to Ms. Hatchett's race discrimination claims, the Court has not considered conduct that occurred before March 24, 2010, because Ms. Hatchett expressly waived and released "any and all" claims stemming from any prior conduct in mediation agreements she signed. Ms. Hatchett asserts six claims for race discrimination, but five of them are waived for her failure to exhaust her administrative remedies on those claims—specifically, the proposed removal in October 2010; her demotion in December 2010; the proposed removal in February 2011; her allegedly coerced retirement; and the March 2011 decision to terminate her. Ms. Hatchett's discrimination claim for her temporary reassignment in August 2010 fails because Ms. Hatchett did not meet her burden under the direct or indirect methods of proof. Ms. Hatchett's hostile work environment claim fails because she has not shown that her work environment was subjectively and objectively un-

reasonable.  Accordingly, the Court will enter final judgment in favor of the VA on all of Ms.

Hatchett's claims.

07/15/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only**:

Jay Meisenhelder
EMPLOYMENT AND CIVIL RIGHTS LEGAL SERVICES
jaymeisenhelder@gmail.com

Debra G. Richards
UNITED STATES ATTORNEY'S OFFICE
debra.richards@usdoj.gov